IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

TIERRE MOULTON

CRIMINAL CASE NO.

1:10-CR-00120-MHS-RGV

## ORDER FOR SERVICE OF FINAL REPORT AND RECOMMENDATION

Attached is the Final Report, Recommendation, and Order of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Cr. R. 58.1(A)(3)(a) and (b).  Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order.  Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the District Court and

any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.**  The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this 22nd day of November, 2010.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

TIERRE MOULTON

CRIMINAL CASE NO.

1:10-CR-00120-MHS-RGV

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Defendant Tierre Moulton ("Moulton") is charged in a six-count superseding indictment with two counts of carjacking in violation of 18 U.S.C. § 2119, two counts of knowingly using and carrying a firearm during and in relation to the carjackings in violation of 18 U.S.C. § 924(c)(1)(A)(ii), and two counts of possessing a firearm after a felony conviction in violation of 18 U.S.C. § 922(g)(1). [Doc. 11].[1] This matter is before the Court on Moulton's motions to suppress statements, identification evidence, and evidence obtained from searches of his person and vehicle. [Docs. 19, 20, & 22]. Following an evidentiary hearing on June 22, 2010,[2] Moulton filed a post-

---

[1] The superseding indictment also includes a forfeiture provision pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461. [Id. at 4].

[2] See Doc. 37 for the transcript of the evidentiary hearing, which will be referred to as "(Tr. at __)." In addition, the parties submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. __)" for the government's exhibits and "(Def. Ex. __)" for Moulton's exhibits.

hearing brief in support of his suppression motions, [Doc. 41],[3] which the government responded to on September 24, 2010, [Doc. 44]. Moulton then filed his reply to the government's response on October 22, 2010. [Doc. 47]. For the following reasons, the undersigned **RECOMMENDS** that Moulton's motions to suppress, [Docs. 19, 20, & 22], be **DENIED**.

## I.  STATEMENT OF FACTS

On December 11, 2009, at approximately 5:35 p.m., Adam Spencer ("Spencer"), called 911 and reported that he had just been robbed at gunpoint at the West End Mall in Atlanta, Georgia. (Tr. at 6, 43, 68-69; Def. Ex. 17). Spencer was in the West End Mall parking lot when he was first approached by the suspect, an African-American male. (Tr. at 68). They discussed the sale or purchase of DVDs, which led Spencer to go into the mall and withdraw $100.00, in the form of five $20 bills, from the ATM machine. (Id.). Thereafter, Spencer returned to the mall parking lot and again met with the suspect, who suggested that they complete the purchase of the DVDs inside the suspect's car, which he pointed out as a light green Chevy. (Tr. at 69). After they both were inside the vehicle, the suspect pointed a

---

[3] Although Moulton initially moved to suppress any statements he made at the time of his arrest or thereafter, see [Doc. 22], he acknowledges in his post-hearing brief that there are no statements to suppress, [Doc. 41 at 1 n.1]. For this reason, it is hereby **RECOMMENDED** that Moulton's motion to suppress statements be **DENIED**.

semiautomatic pistol at Spencer and demanded the money.  (Tr. at 69, 111).  Spencer

handed the suspect in excess of $100.00, including the five $20 bills, and then

jumped out of the vehicle.  (Tr. at 69-70).  At this time, Spencer ran back to his

vehicle and decided to chase after the suspect, who had driven off in the light green

Chevy.  (Id.).

   While following the suspect, Spencer called 911 and advised the dispatcher

that he was robbed at gunpoint and that he was following the perpetrator's vehicle,

which he described as a "light green" Chevy car, but not an SUV, with a tag number

of MP3587.  (Tr. at 35; Def. Ex. 17).  He also identified his own vehicle as a green

Chevy Blazer.  (Tr. at 35; Def. Ex. 17).  At some point during his pursuit, Spencer lost

sight of the suspect in traffic, but was eventually able to catch up with him.  (Tr. at

70).  Spencer followed the suspect to 675 Metropolitan Parkway, and parked across

the street at a used tire shop while he waited for the police to arrive.  (Def. Ex. 17).[4]

   Based on Spencer's 911 call, the dispatch for the APD radioed on the Zone 3

radio channel that an armed robbery victim had pursued his robber's vehicle to 675

---

[4] 675 Metropolitan Parkway, which is located in an area that straddles the third and fourth Atlanta Police Department ("APD") patrol zones, consists of four long parallel warehouses with no break in them.  (Tr. at 10-11, 14, 68).  These spaces are rented to various businesses and art shops.  (Tr. at 42-43).  The main building was the second building to the north, and its front side faced Metropolitan Parkway. (Def. Exs. 11 & 15).  There are four long parallel alleyways between the buildings, which run continuously across the property from east to west.  (Def. Exs. 14 & 15).

Metropolitan Parkway. (Tr. at 6). Based on this report, APD Auto Theft Task Force Officer Grimsley advised fellow APD Auto Theft Task Force Officer Aaron Zorn ("Officer Zorn") that Zone 3 had a "hot call-up" regarding the victim of an armed robbery, and that the suspect's vehicle matched the description of a car taken during a carjacking on November 30, 2009. (Tr. at 6-10, 20-21, 24, 37-38, 78).[5] Officer Zorn switched his radio frequency to Zone 3 and listened to the update regarding the suspect's whereabouts and learned that the suspect was pulling into 675 Metropolitan Parkway. (Tr. at 7, 20). Officer Zorn, who was patrolling nearby in his marked patrol vehicle and pulled into 675 Metropolitan Parkway approximately two minutes later and circled around behind the warehouses and through the alleyways searching for the green Chevy. (Tr. at 7, 10-12, 18-20, 36, 47-50, 162).

At this time, another APD Zone 3 Officer, Karly Derosena ("Officer Derosena"), who was patrolling the area in his marked patrol vehicle with Officer Ramirez, a trainee, arrived at the scene after seeing a report on his vehicle's computer screen. (Tr. at 12, 157-59). Officers Derosena and Ramirez first stopped by the tire shop and spoke with Spencer, who explained to the officers what had

_____

[5] Officer Zorn testified that either Officer Grimsley or Zone 3 radio dispatch advised him that the robbery suspect was driving a green Chevy Monte Carlo with an Ohio tag, which matched the description of the vehicle stolen on November 30, 2009. (Tr. at 7-10, 13, 22-24, 38). However, Officer Zorn did not recall hearing the specific tag number of the suspect's vehicle. (Tr. at 36).

happened at the West End Mall parking lot, and identified the suspect's car as a Monte Carlo. (Tr. at 12, 159, 161-62, 175).[6] After their conversation with Spencer, which lasted less than one minute, Officers Derosena and Ramirez drove across the street to 675 Metropolitan Parkway and began to canvass the area for the suspect's vehicle. (Tr. at 161).

As Officer Zorn pulled to the front of the main building, he immediately observed a green Chevy Monte Carlo with an out-of-state tag, matching the description of the robbery suspect's vehicle. (Tr. at 11, 13, 49, 51, 177). At the same time Officer Zorn was approaching the vehicle from behind, Officer Derosena pulled to the front of it. (Tr. at 11, 13, 51, 162, 164, 178-79). Officers Derosena and Ramirez, who were dressed in their Class A uniforms, including a silver badge on their left breast and APD patches on their arms, exited their patrol vehicle and walked toward the Monte Carlo, but the suspect immediately jumped out of the driver's side door and fled on foot. (Tr. at 11, 51-52, 162-64, 179).[7] As the suspect was looking over his right shoulder at Officer Derosena's patrol vehicle, he did not notice Officer Zorn's vehicle and he ran into the front bumper and fell to the ground. (Tr. at 11, 14, 52).

---

[6] Officer Derosena could not recall whether Spencer had also described the vehicle's color. (Tr. at 161-62).

[7] Officer Derosena testified that when the suspect jumped out of the vehicle, the vehicle was still moving and rolled into another parked vehicle. (Tr. at 163, 165, 179).

The suspect then jumped back up and ran around the main building, down an alleyway, heading toward the west end of the lot.  (Tr. at 11, 52-53).

Officer Zorn initially pursued the suspect on foot, but then went back to his patrol vehicle, pursued the suspect in his vehicle, and eventually drove past the suspect and blocked the end of the alleyway.  (Tr. at 11, 14-15, 53).[8]  Officer Zorn, who was dressed in his black tactical vest, BDU pants, and a gun belt, exited his vehicle and approached the suspect, who crouched down and stuck his hands toward his waistband.  (Tr. at 11, 15, 53-54).  At this time, Officer Zorn repeatedly ordered the suspect to show his hands, but the suspect refused to comply with Officer Zorn's verbal commands.  (Tr. at 11, 16, 56).  Because the suspect had been described as being armed, Officer Zorn struck the suspect's arm with an ASP baton three to four times in an attempt to get him to show his hands.  (Tr. at 11, 15, 54-56).  The suspect, later identified as defendant Moulton, continued to actively resist, but eventually, the officers were able to subdue him, handcuff him with his hands behind his back, and place him under arrest.  (Tr. at 11-12, 15, 56).[9]

---

[8] Officer Zorn testified that Officers Derosena and Ramirez pursued the suspect on foot; however, Officer Derosena testified that while he initially pursued the suspect on foot, he too got back into his patrol vehicle and chased the suspect in his vehicle.  (Tr. at 15, 53, 165-66, 180-81).  Both Officers Zorn and Derosena agreed, however, that Officer Zorn was the first one to reach the suspect.  (Tr. at 11, 16, 166).

[9] While Officer Zorn testified that either Officer Derosena or Officer Ramirez handcuffed the suspect, Officer Derosena testified that Officers Zorn and Ramirez

Once Moulton was placed in handcuffs, Officer Derosena conducted a search of his person and retrieved marijuana and money, including five $20 bills, from Moulton's right front pant pocket. (Tr. at 77-78, 165, 168-69, 182). Officer Derosena then placed Moulton in the backseat of his patrol vehicle, drove him back to the front of the main building, and waited for Zone 4 units to arrive. (Tr. at 58, 165, 167, 170). At this time, the officers observed that the vehicle Moulton had abandoned was a green Chevy Monte Carlo with an Ohio tag bearing the number EP58SZ. (Tr. at 58, 79). In addition, Officer Zorn observed through the open driver's side door of the vehicle a gun in plain view on the driver's side floorboard. (Tr. at 58, 78). After running the vehicle's tag through the system, the officers determined that it was in fact the same vehicle that had been stolen from Willis Cox ("Cox") at the West End Mall during the November 30, 2009, carjacking. (Tr. at 61, 64, 78-79).

Within forty minutes of receiving the initial dispatch of Spencer's 911 call on December 11, 2009, APD Zone 4 Detective Ryan Stephens ("Det. Stephens") and another detective arrived in an unmarked police vehicle at the tire shop across from 675 Metropolitan Parkway and spoke with Spencer about the alleged armed

---

had already handcuffed the suspect by the time he arrived in his patrol vehicle and that they were just waiting for him so that they could place the suspect inside his patrol vehicle. (Tr. at 12, 16-17, 166-67, 181).

robbery.   (Tr. at 66, 68-73, 90, 95, 100, 105).[10]  At this time, Spencer provided Det. Stephens with a description of the suspect's vehicle as a green Monte Carlo, a description of the weapon which Det. Stephens concluded was a semiautomatic pistol, and a general physical description of the suspect although Det. Stephens could not recall what that description was.  (Tr. at 69, 72-73, 77, 111-12, 116, 122).

Upon learning that Moulton had been arrested, Det. Stephens approached the officers at 675 Metropolitan Parkway in order to coordinate a show-up identification.  (Tr. at 91, 109).  After discussing the situation with the officers on the scene, Det. Stephens returned across the street to Spencer and advised him that he was going to show him a person who may or may not be the robbery suspect.  (Tr. at 74-75, 109).  Det. Stephens then transported Spencer, who was seated in the back of the unmarked patrol vehicle, to the location where Moulton was being held.  (Tr. at 74, 76, 106).  As Det. Stephens pulled up, Moulton was standing outside of the patrol vehicle with his hands handcuffed behind his back and two uniformed officers were standing to either side of him.  (Tr. at 74-76, 107, 112).[11]  While traveling to the location for the identification, the detectives did not say anything to Spencer

_____

[10] Det. Stephens was wearing a shirt and tie with an APD winter jacket and his partner was also dressed in plain clothes.  (Tr. at 74).

[11] Det. Stephens had also directed a patrol vehicle spotlight in the direction of Moulton.  (Tr. at 118-19).

to suggest who he should identify as being the robbery suspect.  (Tr. at 75, 120).

Spencer observed Moulton from no more than 20 feet away and positively identified

him as the man who had pulled a gun on him earlier that day.  (Tr. at 76, 114-16).[12]

Later that night at the Zone 4 CID Office, Det. Stephens contacted Cox, the

owner of the light green Chevy Monte Carlo, advised him that "we may or may not

have a suspect," and asked if he would come to the station to help with the

investigation.  (Tr. at 78-80, 126, 129).[13]  Because Cox agreed to come to the station

that night, Det. Stephens prepared a six-picture photo array, which contained

Moulton's photograph, to show to Cox.[14]  Before showing Cox the photos, Det.

---

[12] At some point either prior to or after the show-up identification, Det.
Stephens took custody of the marijuana and cash seized from Moulton's person and
placed it in his unmarked patrol vehicle.  (Tr. at 120-21, 170, 172, 182).

[13] At this time, Spencer also provided Det. Stephens a witness statement at the
Zone 4 CID Office.  (Tr. at 80, 123).  Spencer again described the vehicle as a light
green Chevy and identified the suspect as a young black male wearing a red jacket.
(Tr. at 122).

[14] Det. Stephens testified that a photo array is created through an automated
computer program called "Police Central" by choosing different features of an
individual such as height, weight, hairstyle, and facial hair to generate sample
photographs.  (Tr. at 83-84, 131-33).  Det. Stephens reviewed the narrative from the
November 30 carjacking, containing a description of the suspect as a 5'9" black male,
which matched Moulton's general physical description, and created a photo array
of six black and white photos of black males with short hair, similar in age, and
similar goatee-style facial hair.  (Tr. at 84, 128).

Stephens read Cox a standard photo line-up admonishment, which states in relevant part:

> I am about to show you a group of photographs to see if you can make an identification of the person who committed the crime now being investigated. This group of photographs may or may not include a photograph of the person who committed the crime.
>
> You should only make an identification if you can do so. You may not talk to anyone while viewing the photographs.
>
> Since hair styles, beards and moustaches are easily changed, the photographs you are viewing may or may not depict the hair style or the facial hair similar to that of the person who committed the crime. Also, note that photographs do not always depict the true complexion of a person; it may be lighter or darker than shown. Pay no attention to markings or numbers appearing in any particular photograph.

(Tr. at 85-86; Gov. Ex. 1). Det. Stephens then showed the photo array to Cox by handing him one photo at a time and asked him if he recognized anyone in the array. (Tr. at 87, 135-36). Cox immediately identified the fourth photograph, which was of Moulton, as the person who had carjacked him. (Tr. at 88-89, 137-39). Det. Stephens dated and marked the back of the photograph of Moulton, and Cox then placed his signature on it. (Tr. at 88; Gov. Ex. 1).

## II. DISCUSSION

Moulton contends that his warrantless arrest and the subsequent search of his person and vehicle on December 11, 2009, were without probable cause and therefore violated his Fourth Amendment rights. [Doc. 41 at 13-20; Doc. 47 at 1-9].

Moulton also argues that the show-up identification was unduly suggestive, unreliable, and violated his due process rights.  [Doc. 41 at 23-32; Doc. 47 at 11-17]. Moulton further contends that the subsequent photo array was also unduly suggestive and unreliable.  [Doc. 41 at 33-37].  The Court will address the merits of each of these arguments.

## A.  <u>The warrantless arrest and subsequent search of Moulton</u>

Moulton argues that the marijuana and cash seized from his person by the officers must be suppressed because the officers did not have probable cause to warrant his seizure and subsequent arrest.  [Doc. 41 at 13-20].  In response, the government asserts that the officers had probable cause sufficient to pursue and stop Moulton, that no seizure of Moulton had occurred until he was placed in handcuffs, and that the officers lawfully searched Moulton's person incident to his arrest.  [Doc. 44 at 10-14].

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Generally, a "seizure" warranting Fourth Amendment protection occurs when, in view of the totality of the circumstances surrounding the stop, a reasonable person would not feel "free to decline the officers' requests or otherwise terminate the encounter."  <u>Fla. v. Bostick</u>,

501 U.S. 429, 439 (1991).  This requires either physical force applied by the police on the suspect or submission by the suspect to the officers' assertion of authority. California v. Hodari D., 499 U.S. 621, 626-27 (1991).

The APD officers were on routine patrol when they received a report from radio dispatch about a 911 call from the victim of an armed robbery who had pursued the perpetrator to 675 Metropolitan Parkway and parked across the street at a used tire shop to wait for police to arrive.  (Tr. at 6-10, 12-13, 20-24, 35, 37-38, 78, 157-59; Def. Ex. 17).  The victim reported that the perpetrator was driving a light green Chevy, and officers believed that the car fit the description of one that had been stolen during a carjacking in the same area on November 30, 2009.  After arriving at 675 Metropolitan Parkway and canvassing the area, Officer Zorn and Officers Derosena and Ramirez converged from different directions on a green Chevy Monte Carlo.  (Tr. at 11, 13, 49, 51-52, 162-64, 177-79).  As Officers Derosena and Ramirez exited their patrol vehicle and approached the green Chevy Monte Carlo, Moulton exited the vehicle and fled on foot.  (Tr. at 11, 14, 51-53, 162-64, 179). After the officers were able to block the alleyway, Moulton crouched down and stuck his hands toward his waistband, prompting Officer Zorn, who had been advised that the suspect was armed, to repeatedly order Moulton to show his hands. (Tr. at 11, 14-16, 53-54, 56).  When Moulton refused to comply with his commands,

12

Officer Zorn struck Moulton's arm with an ASP baton three to four times, but Moulton continued to actively resist the officers.  (Tr. at 11-12, 15, 54-56).  Eventually, the officers were able to subdue Moulton, place him in handcuffs, and take him into custody.  (Tr. at 11-12, 15-17, 56, 166-67, 181).

"[A]n officer's approach of a car parked in a public place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure," United States v. Ingram, 151 Fed. App. 597, 599 (9th Cir. 2005) (unpublished) (Reavley, J., dissenting) (internal marks and citations omitted), and here, the officers did nothing to indicate that Moulton was being seized or detained when they first approached him.  There is no evidence that the officers had their weapons drawn or that they were using a threatening tone when they approached Moulton.  Additionally, the fact that the officers partially blocked the vehicle Moulton was in with their patrol cars does not transform the consensual encounter into a seizure under the Fourth Amendment.  United States v. Kim, 25 F.3d 1426, 1428, 1430-31 (9th Cir. 1994) (finding that an officer's initial encounter with defendant, who was seated in his lawfully parked car, was not a seizure where the officer parked his car partially blocking defendant's car, approached defendant's car on foot, and asked for, and received permission to question the defendant).

13

Here, "[t]here is nothing in the record to support a finding that [the officers] did anything to impede [Moulton] from leaving in his vehicle or on foot during the initial encounter," United States v. Robson, No. 2:07-mj-00045-PAL-PAL, 2007 WL 3232524, at *3 (D. Nev. Oct. 30, 2007), and the evidence is to the contrary. In fact, at no point prior to Moulton's apprehension did he submit or in any way yield to the officers. Indeed, the credible testimony establishes that Moulton continued to actively resist even when Officer Zorn attempted to subdue him with the use of an ASP baton. Thus, Moulton was not "seized" for Fourth Amendment purposes at the time the officers approached and pursued him. See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 844 (1998) (citation omitted) ("[P]olice pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment."). In fact, there was no seizure until Moulton was physically restrained by the officers after he fled the vehicle. See United States v. Davis, No. 106 CR 00205, 2006 WL 3751273, at *6 (N.D. Ohio Dec. 18, 2006) (finding defendant who refused to comply with officer's commands to keep his hands in plain view was not seized until after he was placed in handcuffs).

Moulton argues that the police lacked probable cause to arrest him, thus making the arrest and subsequent search of his person illegal. The government bears the burden of demonstrating the legality of a warrantless search and arrest.

14

Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); United States v. Tobin, 923 F.2d 1506, 1517 & n.21 (11th Cir. 1991). "Under the Fourth Amendment, a warrantless arrest requires probable cause." United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing Michigan v. Summers, 452 U.S. 692, 700 (1981)). See also United States v. Costa, 691 F.2d 1358, 1361 (11th Cir. 1982) (per curiam). Probable cause to arrest exists "when an arrest is 'objectively reasonable based on the totality of the circumstances.'" McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (per curiam) (citation omitted). See also Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998) (citation omitted). "This standard is met when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Rankin, 133 F.3d at 1435 (quoting Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995) (per curiam)). See also Beck v. Ohio, 379 U.S. 89, 91 (1964).

"Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." Adams v. Williams, 407 U.S. 143, 149 (1972). "While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, '[m]ere suspicion, common rumor, or even strong reason to suspect are not enough.'" Lopez, 482 F.3d

at 1072 (citing <u>McKenzie v. Lamb</u>, 738 F.2d 1005, 1008 (9th Cir. 1984)).  <u>See also</u>

<u>United States v. Lindsey</u>, 482 F.3d 1285, 1291 (11th Cir. 2007).  In determining

whether probable cause exists, the Court "'deal[s] with probabilities . . . [which] are

the factual and practical considerations of everyday life on which reasonable and

prudent men, not legal technicians, act.'"  <u>Illinois v. Gates</u>, 462 U.S. 213, 231 (1983)

(quoting <u>Brinegar v. United States</u>, 338 U.S. 160, 175 (1949)).

Probable cause is an objective standard.  <u>United States v. Street</u>, 472 F.3d 1298,

1305 (11th Cir. 2006).  The time period relevant to the inquiry is the moment the

arrest was made.  <u>United States v. Allison</u>, 953 F.2d 1346, 1350 (11th Cir. 1992).  The

arresting officers' subjective intention is immaterial in judging whether their actions

were reasonable for Fourth Amendment purposes.  <u>Street</u>, 472 F.3d at 1305.  <u>See</u>

<u>also</u> <u>Devenpeck v. Alford</u>, 543 U.S. 146, 153 (2004) ("Our cases make clear that an

arresting officer's state of mind (except for the facts that he knows) is irrelevant to

the existence of probable cause. . . . [H]is subjective reason for making the arrest

need not be the criminal offense as to which the known facts provide probable

cause.") (citations omitted); <u>Whren v. United States</u>, 517 U.S. 806, 814 (1996).

"[W]hen a group of officers is conducting an operation and there exists at least

minimal communication between them, their collective knowledge is determinative

of probable cause."  <u>United States v. Wilson</u>, 894 F.2d 1245, 1254 (11th Cir. 1990).

See also Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997).  Moreover, an officer need not resolve all inferences and factual conflicts in favor of the suspect. "An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for [his] decision to arrest a suspect." Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla., 956 F.2d 1112, 1120 n.5 (11th Cir. 1992) (citing United States v. Pantoja-Soto, 739 F.2d 1520, 1524 (11th Cir. 1984)).  Finally, probable cause "'must be judged not with clinical detachment, but with a common sense view to the realities of normal life.'" Craig, 127 F.3d at 1042 (quoting Wilson v. Attaway, 757 F.2d 1227, 1236 (11th Cir. 1985)).  Although mere presence at the scene of a crime is not probable cause for a warrantless arrest, see United States v. Di Re, 332 U.S. 581, 593 (1948), probable cause to arrest exists when "the facts and circumstances known to the arresting official are sufficient to warrant a person of reasonable caution to have a belief that a suspect has committed a crime." United States v. Rollins, 699 F.2d 530, 532 (11th Cir. 1983).  See also Beck, 379 U.S. at 91.

In this case, Moulton was not arrested simply because of his presence at the location where a suspected armed robber was reported as being located.  Rather, he was arrested because the officers collectively had sufficient facts and information to provide probable cause to believe that he had just committed an armed robbery.

17

When the officers arrived at the scene, they already had the victim's description of the suspect's vehicle, and they believed that the vehicle may have been stolen in an earlier carjacking.[15] (Tr. at 7-10, 13, 22-24, 38).   The victim had called 911 and reported that he followed the robber to the location in his own vehicle, and he provided details about the robbery to Officers Derosena and Ramirez at the tire shop, including specifically describing the vehicle as a Monte Carlo, before the officers encountered Moulton.  (Tr. at 12, 159, 161-62, 175).  After canvassing the area, the officers located a green Chevy Monte Carlo which matched the victim's description of the suspect's vehicle at the location where the victim reported the suspect had fled, and when the officers approached him, Moulton immediately exited the vehicle and fled on foot.  The officers chased Moulton, and after they caught up with him, he refused to comply with verbal commands to show his hands

---

[15] The officers observed that the vehicle matched the description of a vehicle that had been stolen during a carjacking approximately two weeks prior to this incident.  Moulton argues that "[t]here was no basis to believe that the car reported by [Spencer] was connected to an earlier carjacking" because the tag number provided by Spencer did not match the tag number of the carjacked vehicle, [Doc. 47 at 7]; however, he overlooks the fact that the description given out through radio dispatch of Moulton's vehicle as a green Chevy Monte Carlo with an Ohio tag matched the description of the vehicle stolen on November 30 and it was therefore radioed as a *possible* match.  Once the officers approached Moulton's vehicle, they observed that it was in fact a green Chevy Monte Carlo with an out-of-state tag.  (Tr. at 7-11, 13, 22-24, 38, 49, 51, 58, 79, 177).

and struggled as the officers subdued him.[16]   When these facts and circumstances

are considered "with a common sense view to the realities of normal life," Wilson,

757 F.2d at 1236, the information known to the officers at the time they apprehended

Moulton was sufficient to provide probable cause to arrest him.[17]   See United States

_____

[16] While Moulton argues that the "testimony of Officers Zorn and Derosena is undermined by their inconsistencies" in that Officer Zorn testified that he initially pursued Moulton on foot but then went back to his patrol vehicle and pursued him by car while Officers Derosena and Ramirez pursued him by foot, whereas Officer Derosena testified that Officers Zorn and Ramirez chased Moulton by foot while he, after initially chasing on foot, went back to his patrol vehicle and pursued Moulton in his car, [Doc. 47 at 4-6].  However, these inconsistencies about the mode of pursuit are not material to the specific issues presented here.  Indeed, with regard to the more relevant facts surrounding Moulton's arrest, both Officers Zorn and Derosena agree that Moulton immediately fled from the vehicle as Officers Derosena and Ramirez approached him on foot, that the officers pursued Moulton, and that Officer Zorn was the first to reach and encounter Moulton in the alleyway.  (Tr. at 11, 15-16, 53, 165-66).  Moreover, while Officer Derosena testified that Moulton was already detained and handcuffed when he reached him, this testimony is not directly inconsistent with Officer Zorn's testimony that either Officer Ramirez or Officer Derosena placed Moulton in handcuffs.  (Tr. at 12, 16-17, 166-67, 181).  Therefore, this Court is satisfied that Officers Zorn and Derosena's testimony are worthy of full credit and belief and finds Moulton's attack upon their credibility to be without merit.  See United States v. Gopie, 347 Fed. App. 495, 499 (11th Cir. 2009) (per curiam) (unpublished) (recognizing that credibility determinations are within the province of the fact finder "because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses"); United States v. Bentley, 151 Fed. App. 824, 826 (11th Cir. 2005) (per curiam) (unpublished) (affirming magistrate judge's credibility finding as to the testimony of the officers even where their testimony revealed minor inconsistencies).

[17] Moulton asserts that the officers "made no attempt to speak with [him] to confirm whether he was in the car, if so, why he ran, his relationship to the car, his presence in the alleyway, his whereabouts earlier that evening, or any relation to the alleged robbery," [Doc. 41 at 16], but this argument ignores the fact that when the

v. Perez Ochoa, No. 10-11303, 2010 WL 4458790, at *5 (11th Cir. Nov. 9, 2010) (per curiam) (unpublished) ("When [defendant] failed to comply with [the officers'] instruction to show his hands, reached for his waistband, and proceeded to struggle with the officers until they could handcuff him, his efforts to resist the officers gave rise to probable cause supporting an arrest."); United States v. McGrath, 89 F. Supp. 2d 569, 580 (E.D. Pa. 2000) (finding probable cause to arrest defendant where, among other things, the vehicle defendant was operating matched the description of the vehicle used in a bank robbery, defendant was stopped in close proximity to the bank, and when officers repeatedly ordered defendant to exit the vehicle, defendant refused to comply).[18]

---

officers saw the vehicle matching the description provided by the victim at the location the suspect was seen entering, they approached to investigate and observed Moulton actually flee from the vehicle. Indeed, both Officers Zorn and Derosena identified Moulton as the suspect who fled on foot from the green Chevy Monte Carlo on December 11, 2009. (Tr. at 5, 11, 163-65, 177, 179).

[18] Even assuming the seizure occurred earlier in the encounter, such as when Officer Zorn first encountered Moulton crouched down in the alleyway, the totality of the circumstances, including Moulton's conduct up to that point, provided officers with probable cause for his arrest. See United States v. Lewis, No. CR 08-1136-FRZ-JCG, 2009 WL 1856643, at *5 (D. Ariz. June 29, 2009), adopted at *1 ("Because [d]efendant was arrested within moments of the stop of the vehicle, the circumstances leading up to the vehicle stop are to be considered in addition to the fact that the [d]efendant jumped out of the moving car, abandoned the vehicle and fled from the agents. The circumstances giving rise to a finding of reasonable suspicion for the stop of the vehicle, plus [d]efendant's flight on foot support a finding of probable cause.").

After Moulton was handcuffed, Officer Derosena conducted a search of Moulton's person and retrieved marijuana and money from Moulton's right front pant pocket. (Tr. at 77-78, 165, 168-69, 182). "The officer may conduct a lawful search incident to arrest by searching the area within the immediate control of the arrestee, into which he might be able to reach for a weapon or evidentiary items." Perez Ochoa, 2010 WL 4458790, at *4 (citation omitted). Since Moulton's arrest was supported by probable cause, the items found in his possession and retrieved as a result of a search of his person were seized during a lawful search incident to his arrest and are not due to be suppressed. See United States v. Lyons, 403 F.3d 1248, 1254-55 (11th Cir. 2005); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1222 (11th Cir. 1993). "Such searches are reasonable not only because of the need to disarm the arrestee of any weapons that might be used to resist arrest or effect his escape, but also because of the need to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." United States v. Smith, 694 F. Supp. 2d 1242, 1252-53 (M.D. Ala. 2009) (internal marks and citations omitted). Accordingly, since the officer had probable cause for the warrantless arrest of Moulton, the marijuana and money were lawfully seized from his person incident to his arrest.[19]

---

[19] Having found that Moulton's arrest and subsequent search of his person were lawful, his fruit of the poisonous tree arguments with regard to the search of

B.      **The vehicle search**

"'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" <u>Rakas v. Illinois</u>, 439 U.S. 128, 133-134 (1978) (quoting <u>Alderman v. United States</u>, 394 U.S. 165, 174 (1969)).  Consequently, to prevail on a claim that the government conducted an unconstitutional search under the Fourth Amendment, Moulton must first establish that he had a legitimate expectation of privacy in the place searched that society is prepared to recognize as reasonable.  <u>Id.</u> at 133-134, 143 n.12.  <u>See also</u> <u>California v. Ciraolo</u>, 476 U.S. 207, 211 (1986) (standing to challenge search requires a subjective expectation of privacy that society would recognize as legitimate); <u>United States v. Baron-Mantilla</u>, 743 F.2d 868, 870 (11th Cir. 1984) (per curiam); <u>United States v. Rodriguez-Alejandro</u>, Criminal File No. 1:08-CR-363-TWT, 2009 WL 3377932, at *14 (N.D. Ga. Oct. 19, 2009), adopted at *1. In other words, Moulton has the burden to establish that he has standing to challenge the search or seizure.  <u>United States v. Lately</u>, No. 04-CR-80292, 2005 WL 3434857, at *5 (E.D. Mich. Dec. 13, 2005).

"A legitimate expectation of privacy [must] be proven by factors beyond mere possession, such as a right to exclude or a right to privacy." <u>Rodriguez-Alejandro</u>, 2009 WL 3377932, at *14 (internal marks and citations omitted) (alteration in

_____

his vehicle and identification evidence fail.

original).  "[I]n order for a defendant to show such an expectation of privacy in an automobile, the defendant bears the burden at the suppression hearing to show a legitimate possessory interest in or [a] lawful control over the car."  United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000) (internal marks and citations omitted).  "[A] defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself."  United States v. Eckhart, 569 F.3d 1263, 1274 (10th Cir. 2009) (internal marks and citation omitted) (alteration in original).

"Where, as here, the proponent of a motion to suppress is . . . not the registered owner . . . the proponent bears the burden of establishing that he gained possession from the owner or someone with authority to grant possession."  Id. (internal marks and citations omitted).  Factors to be considered include: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle."  Id. at 1274-75 (internal marks and citation omitted).  "A defendant does not have standing to contest a search where he does not establish a link between himself and the registered owner."  Id. at 1275 (collecting cases).  See also United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998) ("[A] driver using a vehicle with the permission

of an absent owner has been found to possess a reasonable expectation of privacy therein.") (citation omitted).

Moulton did not testify or present any evidence at the suppression hearing regarding his expectation of privacy in the vehicle. Specifically, while the evidence shows that the vehicle Moulton was driving on December 11, 2009, was registered to Cox, Moulton did not present any evidence that he gained possession of the vehicle from someone with authority to grant it, and indeed, the evidence is to the contrary since the vehicle was actually reported stolen during a carjacking on November 30, 2009. (Tr. at 61, 64, 78-79); Eckhart, 569 F.3d at 1275. Under these circumstances, Moulton has failed to establish that he has standing to contest the search of the vehicle that resulted in the seizure of the firearm at issue. United States v. Jackson, No. 4:05CR26-SPM, 2005 WL 2129103, at *1 n.1 (N.D. Fla. Aug. 31, 2005) (finding defendant lacked standing to challenge search of truck where, among other things, he failed to present evidence establishing that he had "lawful possession of the truck so as to establish a legitimate expectation of privacy").[20] Accordingly, it

---

[20] Even if Moulton had a reasonable expectation of privacy in the vehicle he was driving, he voluntarily and without improper police conduct abandoned his expectation of privacy and interest in the vehicle when he exited the vehicle and fled on foot. See United States v. Edwards, 441 F.2d 749, 751-52 (5th Cir. 1971) (finding defendant had no expectation of privacy in car he abandoned by fleeing from police on foot); Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit). See also United States v. Hunter, Criminal File

is **RECOMMENDED** that Moulton's motion to suppress evidence, [Doc. 22], be

**DENIED**.

## C.   The show-up identification of Moulton

Moulton seeks to suppress the identification evidence related to the "show-up" conducted at the scene of his arrest approximately forty minutes after the alleged armed robbery occurred on December 11, 2009, during which Spencer identified him as the robber.  [Doc. 41 at 23-32; Doc. 47 at 11-17].  Specifically, Moulton contends that because Spencer followed the perpetrator to 675 Metropolitan Parkway and had an "unobstructed view of what he thought was the suspect's car, the driver's flight (after the police arrived), and the police pursuit," he was "too closely associated with the 'real time' arrest of [Moulton] to be able to objectively determine whether his features and characteristics matched those of his assailant or whether he simply identified the guy he thought the police chased from a green car." [Doc. 41 at 27].  Moulton further contends that because Spencer passed the green Monte Carlo on his way to the show-up identification and observed

---

No. 1:07-CR-310-1-TWT, 2008 WL 552881, at *7 n.6 (N.D. Ga. Feb. 25, 2008), adopted at *1 (noting that items seized from vehicle would be admissible because defendant abandoned his interest in vehicle when he fled from it following a police chase); United States v. Muhammad, 554 F. Supp. 2d 1314, 1320 (M.D. Fla. 2008), adopted at 1316 (finding that because defendant "abandoned the firearm before he was seized," he "does not have standing to contest the seizure of the abandoned property").

Moulton while he was "flanked by two uniformed officers," handcuffed with his hands behind his back, and illuminated by a police cruiser's spotlight after possibly observing the evidence recovered from him, the process was impermissibly suggestive, and therefore violated his due process rights. [Id. at 28-29]. The government counters that the show-up was not impermissibly suggestive, and even if it was, the identification was still reliable under the totality of the circumstances. [Doc. 44 at 16-21].

The Eleventh Circuit uses a two-step analysis to determine whether an identification process is so unreliable as to violate due process:

> [The Court] must first decide whether the original identification procedure was unduly suggestive. If not, that ends the inquiry. If so, however, [the Court] must then determine whether the suggestive procedure, given the totality of the circumstances, created a substantial risk of irreparable misidentification at trial. Under this analysis, reliability is the linchpin in determining the admissibility of identification testimony.

Williams v. Weldon, 826 F.2d 1018, 1021 (11th Cir. 1987) (internal marks, citations, and footnote omitted). See also United States v. Rodger, No. CR 109-040, 2010 WL 2643268, at *17 (S.D. Ga. Apr. 16, 2010), adopted by 2010 WL 2643267, at *4 (S.D. Ga. June 30, 2010). Thus, even where the procedure is unnecessarily suggestive, exclusion of the identification is not necessarily required if, when viewed in the

26

totality of the circumstances, the identification possesses sufficient indicia of reliability.  Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

While show-up identifications have been widely condemned, the Eleventh Circuit has also recognized that "immediate confrontations allow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons."  Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987) (per curiam).  See also United States v. Cochran, No. 10-cr-55-FtM-36DNF, 2010 WL 3340509, at *2 (M.D. Fla. Aug. 9, 2010), adopted by 2010 WL 3340508, at *1 (M.D. Fla. Aug. 25, 2010).  In fact, "[p]rompt confrontation [is] desirable because it serve[s] to insure the immediate release of an innocent suspect and at the same time enable[s] the police to resume the search for the fleeing culprit while the trail is fresh."  Jamison v. Grier, No. 01 CIV 6678 AGS AJP, 2002 WL 100642, at *20 (S.D.N.Y. Jan. 25, 2002) (internal marks and citations omitted) (second, third, and fourth alterations in original).  Therefore, "show-ups are not unnecessarily suggestive unless the police aggravate the suggestiveness of the confrontation."  Johnson, 817 F.2d at 729.  See also United States v. Walker, 201 Fed. App. 737, 741 (11th Cir. 2006) (per curiam) (unpublished).

While Moulton argues that his presentation to Spencer while "flanked by two uniformed officers," handcuffed with his hands behind his back, and illuminated

27

by a police cruiser's spotlight rendered the process impermissibly suggestive, [Doc. 41 at 28-29], federal courts have repeatedly found that handcuffs and police custody are "necessary incidents of an on-the-scene identification" that do not "render the pre-trial identification procedure unnecessarily suggestive."  See United States v. Bautista, 23 F.3d 726, 730 (2d Cir. 1994) (show-up not unnecessarily suggestive where defendant was presented to the witness "in handcuffs; at night; in the custody of police officers; with his face lit by flashlights; and in the presence of [an officer] who, each time [the witness] identified a suspect, radioed to his fellow officers, '[I]t's a hit'"); Walker, 201 Fed. App. at 741 (defendant "presented for identification singly, in handcuffs, and surrounded by police officers" not unduly suggestive); Rodger, 2010 WL 2643268, at *17 (defendant's presentation "in handcuffs in front of a police car and flanked by two police officers" not unduly suggestive); United States v. Price, No. CR 1:06-081, 2007 WL 430745, at *7 (S.D. Ga. Feb. 7, 2007) (identification not unduly suggestive where within one hour of the robbery, suspect was taken out of police vehicle in handcuffs and in the same clothes he had been wearing when he was arrested).  See also United States v. Martinez, 462 F.3d 903, 911 (8th Cir. 2006) (suspect handcuffed and in police custody not unduly suggestive); United States v. Ortiz, No. 99 CR. 532 DC, 2000 WL 37998, at *1 (S.D.N.Y. Jan. 18, 2000) (finding show-up identification by robbery victims not unduly suggestive where "defendants

28

[were] in handcuffs, standing beside a marked police car, and accompanied by uniformed police officers").

In this case, Moulton was standing outside of a patrol vehicle with his hands handcuffed behind his back and with two uniformed officers standing to either side when Spencer arrived on the scene to make an identification.  (Tr. at 74-76, 107, 112).  Spencer observed Moulton, who had a spotlight shining in his direction, from no more than 20 feet away.  (Tr. at 76, 114-16, 118-19).  While the detectives advised Spencer that they had a suspect in custody and they wanted him to make an identification, the detectives did not say anything to Spencer to suggest who he should identify.  (Tr. at 74-75, 109, 120).  Moulton's arguments about Spencer's observation from across the street of the events leading up to Moulton's arrest as well as the possibility that he observed the items recovered from Moulton's person prior to making his identification are speculative as there was no testimony about what Spencer actually saw.  Moreover, even if the Court accepts that Spencer observed these things, although these circumstances are somewhat more suggestive, "[t]he showup procedure . . . was not unnecessarily suggestive as it was necessitated by the exigent circumstances."  Jamison, 2002 WL 100642, at *21.  Furthermore, even if the Court concluded that the show-up identification was unduly suggestive in this

case, under a totality of the circumstances analysis, Spencer's identification has sufficient indicia of reliability and is therefore not due to be suppressed.

The test for determining the reliability of identification testimony is whether, when viewed in light of the totality of the circumstances, it possesses sufficient indicia of reliability. Manson, 432 U.S. at 114. The factors considered in the "totality of the circumstances" analysis include: the opportunity to view the perpetrator at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the perpetrator; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation. Neil v. Biggers, 409 U.S. 188, 199-200 (1972); Manson, 432 U.S. at 114; Blanco v. Singletary, 943 F.2d 1477, 1508 (11th Cir. 1991); Rodger, 2010 WL 2643268, at *17. A review of these factors in this case leads the Court to conclude that Spencer's identification of Moulton was sufficiently reliable so as to outweigh the corruptive effect of any asserted suggestive confrontation.

The record here reflects that Spencer was paying close attention at the time of the crime and had an adequate opportunity to view Moulton at close range. Indeed, Spencer was in the West End Mall parking lot when he was first approached by Moulton regarding the purchase of DVDs. (Tr. at 68). After Spencer went into the mall to retrieve some cash from the ATM machine, he returned to the parking lot

and again met with Moulton, who suggested that they complete the transaction inside Moulton's vehicle.  (Tr. at 68-69).  Once inside the vehicle, Moulton then robbed Spencer at gunpoint.  (Tr. at 69-70, 111).  Spencer then jumped out of the vehicle and decided to pursue Moulton in his own vehicle.  (Tr. at 69-70).  Spencer's description of Moulton's vehicle was provided to 911 dispatch and the police within minutes after the robbery occurred and proved to match the description of the vehicle once the suspect was apprehended, thereby enhancing its accuracy.  (Tr. at 35, 72; Def. Ex. 17).  Moreover, Spencer demonstrated certainty in his identification of Moulton, indicating to the police officers that Moulton was the perpetrator.  (Tr. at 76, 114-16).[21]  Finally, the show-up occurred within forty minutes of the crime and Spencer, who had followed Moulton to the scene of his arrest, never left that

---

[21] While Moulton argues that Spencer's identification is unreliable because Spencer "failed to identify [him] in any terms" prior to the identification, [Doc. 47 at 15-16 (emphasis omitted)], he mischaracterizes the testimony presented at the evidentiary hearing.  Det. Stephens clearly testified that Spencer had provided him a general physical description of the suspect, but he could not recall what that description was at the hearing.  (Tr. at 72-73, 112, 116, 122).  Additionally, Moulton's reliance on a special master report from the New Jersey Supreme Court regarding misidentifications by eyewitnesses, [Doc. 41 at 30-32], overlooks the totality of the circumstances presented here and is inapplicable to this case.  Furthermore, the Court's "recommendation that the identification testimony should not be suppressed in no way prohibits [Moulton] from cross-examining the pertinent witnesses at trial as to any inconsistencies or discrepancies in their testimony or otherwise questioning them with respect to the procedures used during the identification show-up and the reliability of any positive identifications made."  Rodger, 2010 WL 2643268, at *20 (citations and footnote omitted).

location. (Tr. at 72). Thus, there was not a substantial passage of time which could affect the reliability of the identification. See McGee v. Estelle, 632 F.2d 476, 478 (5th Cir. 1980) (per curiam) (proper identification where lineup took place within two to three hours following the robbery and witness' recollection was fresh); Allen v. Estelle, 568 F.2d 1108, 1114 (5th Cir. 1978) (no passage of substantial amount of time affecting reliability where show-up occurred within one and one-half hours after the crime; Chavis v. Henderson, 638 F.2d 534, 537 (2d Cir. 1980) ("That [the victim's] identification of [the defendant] as the robber took place within one-half hour of their meeting in the lobby and the elevator is strongly supportive of reliability.") (citation omitted). Accordingly, the Court finds under the totality of the circumstances, Spencer's identification of Moulton was sufficiently reliable to meet the requirements of due process. See United States v. Massaro, 560 F. Supp. 2d 96, 107-08 (D. Mass. 2008) (finding witness' show-up identification of defendant was reliable where witness had opportunity to observe suspect through her window, called 911 and gave a fairly accurate description of the suspect's vehicle even though she did not give a detailed physical description of suspect himself, and made a positive identification without hesitation within a short amount of time of the incident). Therefore, it is **RECOMMENDED** that Moulton's motion to suppress identification evidence, [Doc. 20], be **DENIED**.

**D.    The photographic identification of Moulton**

Moulton also moves to suppress identification evidence based on Cox's December 11, 2009, identification of him from the APD photographic array, arguing that the array is unduly suggestive and that, under the totality of the circumstances, there is no basis to find independent reliability of Cox's identification. [Doc. 41 at 33-37]. The government opposes the motion, arguing that the photographic array was not unduly suggestive, and that even if it were, Cox's identification was still reliable. [Doc. 44 at 21-28].

"A due process violation can result when an identification procedure is so suggestive that it undermines the reliability of the resulting identification." United States v. Lawrence, 349 F.3d 109, 115 (3d Cir. 2003). See also Biggers, 409 U.S. at 196; United States v. Walls, 237 Fed. App. 599, 600-01 (11th Cir. 2007) (per curiam) (unpublished). Therefore, "showing a witness a photographic array can constitute a denial of due process when police attempt to emphasize the photograph of a given suspect, or when the circumstances surrounding the array unduly suggest who an identifying witness should select." Lawrence, 349 F.3d at 115 (citing Simmons v. United States, 390 U.S. 377, 383 (1968)); see also Walker, 199 Fed. App. at 886-87. Moulton has the burden of proving that the identification procedure was impermissibly suggestive. Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988).

In evaluating the suggestiveness of a photographic array, courts consider the size of the array, the manner of its presentation by law enforcement officers, and the details of the photographs themselves.  See United States v. McNeill, Criminal No. 06-373, 2007 WL 2234516, at *4 (W.D. Pa. Aug. 2, 2007) (citing United States v. Wiseman, 172 F.3d 1196, 1208-09 (10th Cir. 1999) & United States v. Rosa, 11 F.3d 315, 330 (2d Cir. 1993)).  A defendant in a lineup does not have to be surrounded by others identical in appearance, and a lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from others.  See Cikora, 840 F.2d at 896-97 (district court did not clearly err by admitting identification where only defendant's photograph in lineup had height markings in background and defendant was a different race than several other subjects); Watson v. Harrison, No. CV 06-3626-SJO (JCR), 2008 WL 2163940, at *7 (C.D. Cal. May 12, 2008).  But see O'Brien v. Wainwright, 738 F.2d 1139, 1141 (11th Cir. 1984) (color photograph displayed with five other black-and-white mug shots "stuck out like a sore thumb").

The Eleventh Circuit and other courts have held that if the subjects in a lineup have "substantial similarity in facial features, complexion, facial hair, and general body type and appearance," the lineup is not unduly suggestive.  United States v. Smith, 148 Fed. App. 867, 874-75 (11th Cir. 2005) (per curiam) (unpublished) (internal marks omitted); United States v. Anderson, 156 Fed. App. 218, 220-21 (11th

Cir. 2005) (per curiam) (unpublished); see also United States v. Burbridge, 252 F.3d 775, 780 n.5 (5th Cir. 2001) (that defendant was the only one in photographic lineup with black t-shirt not impermissibly suggestive); Harker v. Maryland, 800 F.2d 437, 444 (4th Cir. 1986) (photo array not impermissibly suggestive where only one other individual wore clothing similar to defendant's clothing, as identification based more on facial features than clothing); United States v. Rose, 362 F.3d 1059, 1066 (8th Cir. 2004) (photographic lineup not unduly suggestive although defendant's eyes may have appeared closed in his photograph and his hair was shorter than the rest, where basic physical features of others were consistent with description provided by witness and generally similar to defendant's features); United States v. Johnson, 56 F.3d 947, 954 (8th Cir. 1995) (photo spread comprised of African-American men with similar features to the African-American suspect was proper).

The Court finds that the APD photographic array, consisting of six black and white photographs of African-American males, is not unduly suggestive because Moulton's photograph is sufficiently similar to the others in size, details, and manner of presentation. The photographs each depict African-American males similar in age and with similar "lower haircuts" and "goatee style" facial hair. (Tr. at 84, 128; Gov. Ex. 1). Likewise, in considering the manner of presentation, each photograph is a facial shot, not a side view, each depicts the same profile consisting

of the shoulders, neck, and face, and each subject is dressed in civilian clothes, not in prison garb. (Gov. Ex. 1). The photographs are all the same size, and the subjects themselves occupy approximately the same amount of space in each photograph. (Id.). Thus, the views or angles presented of each subject, the details of the subjects' physical features, the fact that they all wore civilian clothes, the size of the photographs, and the fact that each was a black and white photo, weigh toward a finding that the APD array was not unduly suggestive. See Smith, 148 Fed. App. at 874-875; Anderson, 156 Fed. App. at 220-21; Johnson, 56 F.3d at 954.

Moulton argues that the APD photo array shown to Cox was unduly suggestive because Det. Stephens "picked photos that matched [Moulton's] appearance, not any pre-array description of the assailant." [Doc. 41 at 33]. Specifically, Moulton argues that because Det. Stephens matched Moulton's appearance, Det. Stephens "may well have disregarded many of the filler photographs, making it more likely that [Moulton] was selected." [Doc. 41 at 34]. Moulton's argument, however, fails "in that [he] [has] not identified any particular trait which was mentioned by any witness . . . such that the photographic displays which were shown to [Cox] might have been rendered suggestive." United States v. Maxime, No. 09-20470 CR MARTINEZ, 2010 WL 2635097, at *2 (S.D. Fla. June 9, 2010), adopted by 2010 WL 2635099, at *1 (S.D. Fla. June 30, 2010). "For example, if

36

[Moulton] had alleged that a witness to the incident described the particular subjects as being black, and the only photo of a black male in the array was that of the particular [d]efendant, the array could be argued to be suggestive." Id.  Here, Cox's description of the suspect as a 5'9" black male does not "contain any descriptive characteristic . . . upon which [Moulton] could be singled out of [his] respective lineup[]." Id.  "Indeed, the array does not strike the Court as one that suggests one photo is more likely to be chosen over any other." United States v. Turner, Criminal Action No. 2:10-cr-15-WKW, 2010 WL 3880043, at *3 (M.D. Ala. Aug. 4, 2010), adopted by 2010 WL 3879965, at *3 (M.D. Ala. Sept. 28, 2010).

In sum, Moulton's photograph does not make him conspicuous or render the array impermissibly suggestive.  See United States v. Sanchez, 24 F.3d 1259, 1263 (10th Cir. 1994) (finding that a six-person lineup in which the defendant was the only one with his eyes closed was not unduly suggestive); Cikora, 840 F.2d at 896-97 (although defendant's photograph had height markings in the background, and the defendant was a different race than several other persons photographed, the lineup was held not to be impermissibly suggestive); Watson, 2008 WL 2163940, at  *7 (where all individuals in six-person lineup were of similar age and complexion, with

extremely short hair, not unduly suggestive even though petitioner was only one who was bald and had a lip piercing).[22]

Moulton also argues that Det. Stephens' "pre-array comments" suggested that an "identification was necessary and that he had a suspect and possibly [Cox's] car," which he contends "incentivized [Cox] to identify someone." [Doc. 41 at 34-35]. The record, however, belies Moulton's assertion in this regard. In particular, Det. Stephens testified that after he arrived at the station following Moulton's arrest on December 11, 2009, he contacted Cox and advised him that "we may or may not have a suspect" and asked if he would help with the investigation. (Tr. at 129). Later that night, Cox met with Det. Stephens who then showed Cox the photo array. Prior to showing Cox the photos, Det. Stephens read Cox a standard photo line-up admonishment, which included advising Cox that the "group of photographs may or may not include a photograph of the person who committed the crime," and that he "should only make an identification if you can do so." (Tr. at 85-86; Gov. Ex. 1).

_____

[22] Although Moulton argues that he was the only one depicted in a photograph with a visible tattoo on his neck, [Doc. 41 at 12], the Court's copies of the photographs used in the photo array do not depict visible tattoos in any of the photographs, see (Gov. Ex. 1). Regardless, even if the photograph of Moulton was the only photo in the array with a visible tattoo, this distinction still does not render the lineup unduly suggestive. See United States v. Knight, No. 07-20923-CR, 2008 WL 4755678, at *2 n.4 (S.D. Fla. Oct. 27, 2008), adopted at *1 (finding distinctions such as background lighting, tattoo on neck, and lighter complexion in defendant's photograph not impermissibly suggestive).

Det. Stephens' testimony also reveals that Cox "fully understood that the suspect was not necessarily among the photos presented to [him]." Turner, 2010 WL 3879965, at *2; (Tr. at 86). See also United States v. Storey, No. 95-3383, 97 F.3d 1465, 1996 WL 532654, at *1 (10th Cir. Sept. 17, 1996) (unpublished) (affirming district court's conclusion that photo array was not impermissibly suggestive based on officer's efforts to create matching photographs, the similarities between the photographs and a similar admonishment to the witness). Therefore, Moulton has failed to show that the presentation of the photo array was tainted by any suggestive comments by Det. Stephens.

Because the APD photographic array was not unconstitutionally suggestive, the inquiry ends there. Williams, 826 F.2d at 1021 ("We must first decide whether the original identification procedure was unduly suggestive. If not, that ends the inquiry."). However, even if the array were found to be unduly suggestive, Cox's identification of the carjacker was reliable, and thus, the identification should stand.

As previously stated, the test for determining the reliability of identification evidence is whether the identification, when viewed in the totality of the circumstances, possesses sufficient indicia of reliability. Manson, 432 U.S. at 114. A review of the Biggers factors in this case leads the Court to conclude that Cox's identification of Moulton was sufficiently reliable to outweigh any corruptive effect

of the allegedly suggestive confrontation.  Cox had an adequate opportunity to view

the perpetrator at the time of the crime and even provided a description of the

suspect as a 5'9 black male, which matches Moulton's general physical appearance.

(Tr. at 84, 128, 139).  While the evidence does not indicate how long the encounter

lasted or the degree of attention at the time of the incident, Cox had an opportunity

to view Moulton as he carjacked him, as shown by Cox's ability to provide a general

description of Moulton and to identify Moulton immediately and without hesitation

as the man who had carjacked him.   (Tr. at 88-89, 137-39).   Indeed, Cox

demonstrated unequivocal certainty in his identification of Moulton.  (Id.).  Cox's

high degree of certainty during his identification weighs in favor of a finding of

reliability.[23]  With regard to the last factor, less than two weeks had elapsed from the

time of the carjacking on November 30, 2009, to the identification on December 11,

2009.  The Eleventh Circuit has held that the passage of over eight months between

the crime and an in-court identification "was not so long as to lead to the conclusion

that the identification was unreliable."  United States v. Douglas, 489 F.3d 1117, 1127

(11th Cir. 2007) (per curiam).  Accordingly, the Court finds that under the totality of

---

[23] Moulton argues that the fact that Cox did not hesitate to identify him is a
result of the unduly suggestive presentation of the photo array in which Det.
Stephens provided non-verbal cues by staring at Cox's eyes during the array.  [Doc.
41 at 36].  However, a review of the testimony reveals that there is no evidence that
Det. Stephens in any way influenced Cox's identification of Moulton, and the Court
rejects this argument.

the circumstances, Cox's identification of defendant was sufficiently reliable to meet the requirements of due process.  See Manson, 432 U.S. at 114; Biggers, 409 U.S. at 199-200; Blanco, 943 F.2d at 1508.  Therefore, the undersigned **RECOMMENDS** that Moulton's motion to suppress identification evidence, [Doc. 19], be **DENIED**.

### III.  CONCLUSION

For the foregoing reasons and cited authority, the undersigned Magistrate Judge **RECOMMENDS** that Moulton's motions to suppress statements, identification evidence, and evidence obtained from searches of his person and vehicle, [Docs. 19, 20, & 22], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO RECOMMENDED** and **ORDERED**, this 22nd day of November, 2010.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

41