## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| UNITED STATES OF AMERICA, | : | |
| --- | --- | --- |
| Plaintiff, | : | CRIMINAL ACTION |
| v. | : | 1:10-CR-120-MHS |
| TIERRE MOULTON, | : | |
| Defendant. | : | |

### ORDER

This action is before the Court on defendant's motions to suppress statements and evidence, to exclude photographic lineup and in-court eyewitness identification, and to suppress show-up identification. The Magistrate Judge conducted an evidentiary hearing and has issued a Report and Recommendation ("R&R") recommending that the motions be denied. Defendant has filed objections to the R&R. For the following reasons, after a de novo review of the record, the Court concludes that the R&R is correct and that defendant's objections are without merit. Accordingly, the Court adopts the R&R and denies defendant's motions.

Background

On December 11, 2009, Adam Spencer was robbed at gunpoint in the parking lot of West End Mall in Atlanta. The robber fled in an automobile, and Spencer gave chase in his own vehicle. While following the robber, Spencer called 911, reported the robbery, and said he was chasing the perpetrator's car, which he described as a light green Chevy with a tag number of "MP3587." After temporarily losing sight of the vehicle, Spencer caught up with it and followed it to a warehouse complex at 675 Metropolitan Parkway. Spencer parked across the street at a used tire shop and waited for police to arrive.

Three officers of the Atlanta Police Department responded to the scene. First, after receiving a report that the suspect's vehicle matched the description of a car taken during a carjacking on November 30, 2009, Officer Aaron Zorn, who was patrolling nearby in his marked patrol vehicle, pulled into 675 Metropolitan Parkway and circled around behind the warehouses and through the alleyways searching for the green Chevy. At the same time, Officer Karly Derosena and a trainee, Officer Ramirez, stopped at the tire shop and spoke with Spencer, who explained what had happened and

identified the perpetrator's car as a Chevy Monte Carlo. Officers Derosena
and Ramirez then drove across the street to 675 Metropolitan Parkway and
began to canvass the area for the suspect's vehicle.

As Officer Zorn pulled to the front of the main building, he observed a
green Chevy Monte Carlo with an out-of-state tag. At the same time Officer
Zorn was approaching the vehicle from behind, Officer Derosena pulled to the
front of it, and he and Officer Ramirez exited their patrol car and walked
toward the Monte Carlo. An individual later identified as defendant Tierre
Moulton jumped out of the Monte Carlo's driver's side door and fled on foot,
eventually running around the main building and down an alleyway. Officer
Zorn initially pursued Moulton on foot, then returned to his vehicle and drove
past Moulton and blocked the end of the alleyway. Meanwhile, Officer
Derosena also initially pursued Moulton on foot but then returned to his
vehicle and pursued Moulton in his vehicle.

Officer Zorn reached Moulton first. As he exited his vehicle and
approached, Moulton crouched down and stuck his hands toward his
waistband. Officer Zorn repeatedly ordered him to show his hands but

3

Moulton did not comply, so Officer Zorn struck the suspect's arms several times with his baton in an attempt to get him to show his hands. Moulton continued to resist, but the officers were eventually able to subdue him, handcuff his hands behind his back, and place him under arrest. Once Moulton was in handcuffs, Officer Derosena searched him and found marijuana and cash in Moulton's right front pants pocket. Officer Derosena then placed Moulton in the back seat of his patrol car and drove him back to the front of the main building.

At this time, the officers saw that the vehicle Moulton had abandoned was a green Chevrolet Monte Carlo with an Ohio tag bearing the number "EP58SZ." In addition, Officer Zorn looked through the open driver's side door of the vehicle and saw a gun in plain view on the driver's side floorboard. After running the vehicle's tag through the system, the officers confirmed that it was the same vehicle that had been stolen from Willis Cox at the West End Mall during the November 30, 2009, carjacking.

Meanwhile, Detective Ryan Stephens and another detective arrived in an unmarked police vehicle at the tire shop and spoke with Spencer, who

4

described the suspect's vehicle, the weapon he used, and his general physical appearance. After Moulton's arrest, Det. Stephens coordinated a show-up identification of the suspect by Spencer. Det. Stephens placed Spencer in the back of his unmarked patrol car and drove him to the location where Moulton was being held, telling him that he was going to show him a person who might or might not be the robber. As Det. Stephens pulled up, Moulton was standing outside the patrol car between two uniformed officers with his hands cuffed behind his back. After seeing Moulton from a distance of no more than 20 feet, Spencer positively identified him as the man who had robbed him earlier that day.

Later that night, Det. Stephens contacted Cox, told him "we may or may not have a suspect" in his carjacking, and asked him to come to the station to help with the investigation. Det. Stephens prepared a six-picture photo array, including Moulton's photograph. Before showing Cox the photos, Det. Stephens read him a standard photo lineup admonishment, advising him, among other things, that the photographs might or might not include a photograph of the person who committed the crime. Det. Stephens then showed the photo array to Cox by handing him one photo at a time and

5

asking if he recognized anyone. Upon being handed the fourth photograph, which was of Moulton, Cox immediately identified him as the person who had carjacked him.

Subsequently, Moulton was charged with two counts of carjacking in violation of 18 U.S.C. § 2119,[1] two counts of knowingly using and carrying a firearm during and in relation to the carjackings in violation of 18 U.S.C. § 924(c)(1)(A)(ii), and two counts of possessing a firearm after a felony conviction in violation of 18 U.S.C. § 922(g)(1). Moulton has moved to suppress the cash, marijuana, and firearm seized following his arrest, as well as evidence of the show-up identification by Spencer, on the grounds that they are the fruit of an unlawful warrantless arrest without probable cause. Moulton has also moved to suppress the show-up identification by Spencer and the subsequent photo array identification by Cox on the grounds that they were unduly suggestive and unreliable.

---

[1] In addition to the November 30, 2009, carjacking of the Monte Carlo, defendant is also charged with a September 17, 2008, carjacking of a Dodge Neon.

6

Discussion

I.    Probable Cause for Arrest

    A.    Report and Recommendation

The Magistrate Judge found that Moulton was "seized" for Fourth Amendment purposes when he was physically restrained by the officers after he fled the vehicle, and that at the time of the seizure, the officers collectively had sufficient facts and information to provide probable cause to believe that Moulton had just committed an armed robbery. R&R at 14, 17. Specifically, the Magistrate Judge found that the following information known to the officers at the time they apprehended Moulton was sufficient to provide probable cause to arrest him: (1) the robbery victim described the perpetrator's vehicle as a green Chevy Monte Carlo, which matched the description of a vehicle stolen in an earlier carjacking; (2) the victim stated that he had followed the perpetrator's vehicle to 675 Metropolitan Parkway after the robbery; (3) a green Chevy Monte Carlo was found at the location where the victim reported the perpetrator had fled; (4) when the officers approached the vehicle, Moulton jumped out of the vehicle and fled on foot; and (5) after the officers caught up with him, Moulton refused to comply with verbal commands to show his hands and struggled as the officers subdued

him. Id. at 18-19. The Magistrate Judge also found that, even if the seizure occurred earlier in the encounter, such as when Officer Zorn first found Moulton crouched down in the alleyway, the totality of the circumstances, including Moulton's conduct up to that point, provided the officers with probable cause for his arrest. Id. at 20 n.18.

Having found that Moulton's arrest was lawful, the Magistrate Judge also found that the marijuana and cash were lawfully seized from Moulton's person incident to his arrest, and that Moulton's fruit of the poisonous tree arguments with regard to the search of his vehicle and identification evidence must fail. Id. at 21 & n.19. Finally, with regard to the vehicle search, the Magistrate Judge also found that Moulton lacked standing to raise a Fourth Amendment claim because there was no evidence that he owned the vehicle or gained possession of it from someone with authority to grant it – to the contrary, the evidence showed that the vehicle had been stolen in an earlier carjacking – and he therefore lacked any legitimate expectation of privacy in the vehicle. Id. at 24. Moreover, even if defendant had a reasonable expectation of privacy in the vehicle, the Magistrate Judge found that he voluntarily and without improper police conduct abandoned his expectation

of privacy and interest in the vehicle when he exited the vehicle and fled on foot. Id. at 24 n.20.

B.    Defendant's Objections

Defendant objects to the Magistrate Judge's findings and contends that the information known by the officers at the time of the arrest does not support a finding of probable cause.  First, defendant contends that the victim's description of the vehicle does not support a finding of probable cause because (1) the license plate number reported by the victim did not match the tag number of the vehicle driven by Moulton; (2) while attempting to follow his assailant, the victim lost sight of the vehicle and then re-established sight with a vehicle he *thought* was his assailant's; (3) the victim followed the vehicle until it turned into the warehouse complex at 675 Metropolitan Parkway, where he again lost sight of it; and (4) the victim did not give officers a physical description of his assailant or his clothing.

Second, defendant argues that the officers' belief that Moulton's vehicle might have been previously carjacked does not support a finding of probable cause because the officers had no basis for such a belief.  Defendant notes

9

that the previously carjacked vehicle was a Chevy Monte Carlo with Ohio plates numbered "EP58SZ," but that in his 911 call, the victim did not mention that his assailant's vehicle was a Monte Carlo or that it had Ohio plates, and he gave a plate number ("MP3587") that was not a match for the previously carjacked vehicle.

Third, defendant contends that neither the fact that officers encountered a green Monte Carlo matching the victim's description nor the fact that defendant fled when the officers approached the vehicle supports a finding of probable cause. Again, defendant cites the fact that the victim lost sight of the vehicle while giving chase and never mentioned that it had an out-of-state tag. As for defendant's flight, he argues that this justified nothing more than an investigatory stop, not an arrest. Defendant also cites conflicts in the testimony of Officers Zorn and Derosena regarding their pursuit of Moulton as undermining their testimony about the initial encounter and arrest itself. Defendant also objects to the Magistrate Judge's finding that both Officers Zorn and Derosena identified Moulton as the suspect who fled on foot.

Finally, defendant objects to the Magistrate Judge's finding that he was not seized until he was physically restrained by the officers after allegedly refusing to show his hands. Defendant contends that he was in custody from the moment that Officer Zorn confronted him with a baton crouched in the alleyway prior to his alleged refusal to show his hands. Regardless of whether he was seized when first confronted in the alleyway or after he allegedly refused to show his hands, defendant contends that the collective information in the possession of the officers justified nothing more than an investigative stop, not an arrest.

Defendant contends that since he was arrested without probable cause, the subsequent search of his person and the vehicle were also invalid and the evidence seized as a result of those searches, as well as the subsequent show-up and photo identifications, must be excluded as fruits of the unlawful arrest. Defendant objects to the Magistrate Judge's finding that he lacks standing to challenge the search of the automobile on the grounds that the fruit of the poisonous tree doctrine applies even if the location where the fruit is found is not a place in which the complaining defendant has standing to contest the search.

11

## C.    Analysis

Probable cause to arrest exists "when an arrest is 'objectively reasonable based on the totality of the circumstances.'" McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (per curiam) (quoting Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002)). "This standard is met when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998) (quoting Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995)(per curiam)). Moreover, "when a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause." United States v. Wilson, 894 F.2d 1245, 1254 (11th Cir. 1990). Finally, probable cause "'must be judged not with clinical detachment, but with a common sense view to the realities of normal life.'" Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997)(quoting Wilson v. Attaway, 757 F.2d 1227, 1236 (11th Cir. 1985)).

12

Applying these principles, the Court concludes that the officers in this case had probable cause to arrest Moulton, regardless of whether the seizure occurred when the officers physically restrained him after he refused to show his hands, as the Magistrate Judge found, or when Officer Zorn first confronted him in the alleyway, as defendant contends. Whenever the seizure occurred, the officers collectively had reasonably trustworthy information of at least the following relevant facts and circumstances: (1) an individual had been robbed at gunpoint; (2) the assailant escaped driving a light green Chevy Monte Carlo; (3) the robbery victim pursued his assailant in his own vehicle to the warehouse complex at 675 Metropolitan Parkway;[2] (4) a light green Chevy Monte Carlo was found at the warehouse complex;[3]

---

[2] There is no evidence that the officers knew the victim had temporarily lost sight of the Monte Carlo during his pursuit. Regardless, this fact does not undermine the probable cause finding. It is highly unlikely that there were two light green Chevy Monte Carlos in the vicinity at the time, and that the victim had lost sight of the one driven by his assailant and then seen the other, which he followed to the warehouse complex. The police need not take into account such farfetched scenarios in determining whether there is probable cause for an arrest. See Bailey v. Bd. of Cnty. Commr's of Alachua Cnty., Fla., 956 F.2d 1112, 1120 n.5 (11th Cir. 1992) ("An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for her decision to arrest a suspect.").

[3] The fact that the tag number reportedly given by the victim during his pursuit did not exactly match the tag number of the vehicle found in the warehouse (continued...)

and (5) when officers approached the Monte Carlo, an individual jumped from the vehicle and fled on foot and was subsequently cornered in an alleyway.[4] Even setting aside the officers' belief that the Monte Carlo might have been stolen in an earlier carjacking, a belief for which defendant contends they had no basis, these facts alone were sufficient to provide probable cause to believe that the individual cornered in the alleyway had just committed an armed robbery.

The Court finds no merit in defendant's contention that the probable cause finding is undermined by inconsistencies in Officer Zorn's and Officer Derosena's accounts of their pursuit of Moulton. The Court agrees with the

---

[3](...continued)

complex also does not undermine the probable cause finding. As experienced police officers are no doubt aware, it would not be unlikely for a citizen attempting to read a tag number while pursuing a vehicle in traffic after having been robbed to make a mistake, or for the number to be garbled during transmission by cell phone and police radio. Moreover, the tag number reportedly given by the victim ("MP3587") and the tag number of the vehicle found at the warehouse complex ("EP58SZ"), while not an exact match, are sufficiently similar that a reasonable police officer could have attributed the discrepancy to one of the above factors.

[4] Contrary to defendant's contention, the evidence shows that the person who jumped from the vehicle and the person arrested in the alleyway were one and the same. Transcript of Evidentiary Hearing held June 22, 2010 ("Tr.") at 11. The fact that no car keys were seized from Moulton means nothing. Since the evidence shows that the car was still moving when Moulton jumped out, Tr. at 179, he must have left the keys in the ignition.

14

Magistrate Judge that "these inconsistencies about the mode of pursuit are not material to the specific issues presented here."   R&R at 19 n.16. Regardless of precisely what happened during the officers' pursuit of Moulton, the facts enumerated above are undisputed and are sufficient to support a finding of probable cause.

Finally, defendant's contention that his flight justified nothing more than an investigative stop is without merit. In United States v. Tookes, 633 F.2d 712, 716 (11th Cir. 1980), cited by defendant, the court found that the defendant's flight, coupled with the officers' knowledge that the defendant was a convicted felon and that a number of drug arrests had been made in the neighborhood, "did not rise to the level of probable cause" for an arrest. The facts in this case are quite different. In addition to Moulton's flight, the officers also knew that the vehicle from which he jumped and ran matched a robbery victim's description of his assailant's vehicle, which he had followed to that location. These facts, taken together, gave the officers probable cause to arrest Moulton for the robbery.

15

Since defendant's arrest was lawful, his argument that evidence seized from the subsequent searches of his person and the vehicle, as well as the subsequent show-up and photo identifications, must be excluded as fruit of the poisonous tree is also without merit.

II.     Show-Up Identification

    A.     Report and Recommendation

The Magistrate Judge found that the show-up identification conducted at the scene of Moulton's arrest, during which Spencer identified Moulton as the man who had robbed him, was not unduly suggestive. Specifically, the Magistrate Judge found that Moulton's presentation to Spencer while flanked by two uniformed police officers with his hands handcuffed behind his back and illuminated by a police cruiser's spotlight did not render the process impermissibly suggestive. R&R at 27-28. The Magistrate Judge also found that Spencer's identification was not impermissibly tainted by his observation of the events leading up to Moulton's arrest and the items recovered from Moulton's person for the following reasons: first, because there was no testimony about what Spencer actually saw; and second, even if Spencer did

16

observe these things, the show-up was not unnecessarily suggestive because it was necessitated by exigent circumstances. R&R at 29.

The Magistrate Judge further found that, even if the show-up identification was unduly suggestive, considering the totality of the circumstances, Spencer's identification of Moulton had sufficient indicia of reliability to be admitted. Reviewing the factors relevant to determining the reliability of identification testimony, the Magistrate Judge noted that (1) Spencer had a face-to-face conversation with his assailant in the West End Mall parking lot regarding the purchase of DVDs before entering the assailant's vehicle, where the robbery occurred, so he was paying close attention at the time of the crime and had an adequate opportunity to view his assailant at close range; (2) Spencer's description of his assailant's vehicle provided to 911 dispatch and the police within minutes after the robbery occurred proved to be accurate; (3) Spencer demonstrated certainty when he identified Moulton as his assailant; and (4) the identification occurred only approximately 40 minutes after the crime occurred.

17

B.    Defendant's Objections

Defendant objects to all of the Magistrate Judge's findings.    He contends that the events leading up to the identification, including Spencer's close involvement in the chase and his vantage point across the street, which allowed him to observe the actual arrest, put tremendous pressure on Spencer to positively identify the person arrested as his assailant. Defendant also contends that the procedures surrounding the actual identification – putting Spencer in a police car where evidence seized from Moulton had already been placed; driving him past the car from which the suspect was seen fleeing; and asking him to identify Moulton from the backseat of the car while Moulton stood handcuffed, spotlighted, and surrounded by police officers – were unduly suggestive.  Defendant contends that there was no exigency justifying such a suggestive show-up identification since a later identification, including a lineup procedure at the police precinct, was clearly an option.

Defendant also objects to the Magistrate Judge's finding that, considering the totality of the circumstances, the show-up identification was reliable. Defendant argues that, under the unique facts of this case, the short

length of time between the crime and the identification actually weighs against, rather than in favor of, its reliability because the victim's pursuit of his assailant and his close observation of the arrest would have created a high level of stress, making a reliable identification less likely. Defendant argues that Spencer provided no pre-identification description that matched Moulton, but that his subsequent description of the car and his assailant conformed to what he saw at the show-up. Defendant also points out that Spencer was asked to identify Moulton through the windshield of an automobile, at night, from a distance of twenty feet. Under these circumstances, defendant contends, there was a substantial risk of an incorrect identification.

## C. Analysis

"Although show-ups are widely condemned, immediate confrontations allow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit quick release of innocent persons." Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987) (per curiam) (citation omitted). "Therefore, show-ups are not unnecessarily suggestive unless the police aggravate the suggestiveness of the confrontation." Id. In this case,

the Magistrate Judge correctly found that the police did not aggravate the suggestiveness and thus the confrontation was not impermissible.

First, immediately prior to the show-up, the police said nothing to Spencer other than "we are going to show you a person that may or may not have been the suspect of the 911 call." Tr. at 75, 120. As for the fact that Moulton was presented to Spencer handcuffed and standing between two police officers, the Magistrate Judge correctly noted that "handcuffs and police custody are 'necessary incidents of an on-the-scene identification' that do not 'render the pre-trial identification procedure unnecessarily suggestive.'" R&R at 28 (quoting United States v. Bautista, 23 F.3d 726, 730 (2nd Cir. 1994)).

Second, even though other circumstances – such as Spencer's involvement in the chase and his ability to observe the arrest from across the street – may have made the show-up somewhat more suggestive, the Magistrate Judge correctly found that the show-up was not *unnecessarily* suggestive because it was necessitated by exigent circumstances. A prompt confrontation was necessary both "to prevent the mistaken arrest of [an]

20

innocent person[]," Bautista, 23 F.3d at 730; and, if the police did have the wrong man, to permit them to "resume the search for the fleeing culprit while the trail [wa]s still fresh." United States ex rel. Cummings v. Zelker, 454 F.2d 714, 716 (2nd Cir. 1972) (quoting Bates v. United States, 405 F.2d 1104, 1106 (D.C. Cir. 1968)). A lineup conducted later at the police precinct, as defendant suggests, would not have satisfied either of these exigencies.

Even if a show-up identification is unduly suggestive, it is still admissible if, considering the totality of the circumstances, there are sufficient indicia of its reliability. Manson v. Braithwaite, 432 U.S. 98, 114 (1977). The factors to be considered in determining the reliability of the identification "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. 188, 199-200 (1972). In this case, the Magistrate Judge correctly found that, under the totality of the circumstances, Spencer's identification of Moulton has sufficient indicia of reliability to be admitted.

All of the relevant factors support the reliability of the identification. First, there is no dispute that Spencer had ample opportunity to view his assailant at the time of the crime. The evidence shows that they engaged in a face-to-face conversation in the parking lot of West End Mall regarding the purchase of DVDs and, after Spencer obtained cash from an ATM in the mall, Spencer and his assailant got into the assailant's car to complete the transaction, where the robbery then took place. Tr. at 68-69. Second, during the time leading up to the robbery, Spencer's attention was focused on his conversation with his assailant regarding the purchase of DVDs. There is no evidence that Spencer's attention was in any way distracted from the business at hand or the individual with whom he was dealing. Third, prior to the show-up, Spencer accurately described the car his assailant was driving and the gun that was used in the robbery. Tr. at 35, 69, 72, 111. Contrary to defendant's contention, Spencer also gave Det. Stephens a physical description of his assailant, but Det. Stephens could not remember what that description was. Tr. 72-73, 116. Fourth, Spencer expressed a high degree of certainty when he identified Moulton as the robber. Tr. at 76. Finally, only approximately 40 minutes elapsed between the time the crime occurred and Spencer's identification of Moulton as the robber. Tr. at 72.

22

The Court rejects defendant's contention that the short length of time between the crime and the identification should weigh against reliability. In support of this argument, defendant cites a Special Master's Report in a New Jersey case regarding eyewitness misidentifications. The Report found that "while moderate levels of stress improve cognitive processing and might improve accuracy, an eyewitness under high stress is less likely to make a reliable identification of the perpetrator." Report at 43. At the time of the show-up, defendant argues, Spencer was still under a high level of stress due to the recent robbery and pursuit, and he was therefore less likely to make a reliable identification. The Special Master's Report, however, does not define "high" or "moderate" levels of stress, and defendant cites no evidence to support his conclusion that Spencer was under a high rather than a moderate level of stress at the time of his identification of Moulton. If the latter, then according to the Special Master's Report, the reliability of Spencer's identification would have actually been enhanced rather than diminished.

Defendant's other objections are also without merit. As noted above, the evidence does not support defendant's contention that Spencer gave no

physical description of his assailant until after the show-up. Nor is there any reason to believe that Spencer's view of Moulton from the backseat of Det. Stephens' car at a distance of approximately 20 feet was not sufficient to permit a reliable identification.

III. Photographic Lineup Identification

A. Report and Recommendation

The Magistrate Judge found that the photographic lineup presented to Cox, the victim of the earlier carjacking, which consisted of six black-and-white photographs of African-American males, was not unduly suggestive because Moulton's photograph was sufficiently similar to the others in size, details, and manner of presentation. R&R at 35. The Magistrate Judge further found that, under the totality of the circumstances, Cox's identification of Moulton was sufficiently reliable to satisfy due process requirements. Id. at 40-41.

B. Defendant's Objections

Defendant objects to the Magistrate Judge's findings on the following grounds. First, defendant contends that Det. Stephens picked photos that

24

matched Moulton's appearance rather than any pre-array description of the assailant by Cox, and for this reason the array was unreliable. Second, defendant argues that Det. Stephens' pre-array comments about "having a suspect" and the need for "help" with the investigation suggested, contrary to proper practice, that an identification was necessary and that he had a suspect and possibly Cox's car. Finally, defendant objects to the police's failure to conduct a double-blind lineup, in which the person administering the lineup as well as the witness are unaware of the identity of the suspect. Defendant argues that since Det. Stephens, who administered the lineup to Cox, knew that Moulton was the suspect, he was likely giving non-verbal cues to Cox, conveying both which photo he should choose and a general pressure to choose someone.

## C. Analysis

Defendant's objection to the construction of the lineup array is without merit. Before the lineup, Cox had described the carjacker as a black male, 5'9" in height. All of the photos in the lineup array were of black males.[5]

---

[5] Since the photos are all head-and-shoulder shots, the height of the persons depicted is not discernible.

Otherwise, Det. Stephens selected photos that were similar in appearance to Moulton in terms of age, haircut, and facial hair. This array was not unduly suggestive.

Defendant again relies on the New Jersey Special Master's Report, but it is not to the contrary. The Report states in pertinent part: "[T]he consensus view appears to be that the fairness of a lineup, and the reliability of a resultant identification, are also diminished if the array is not composed of fillers who [1] fit the description given by the witness prior to the lineup and [2] are sufficiently similar to the suspect so that the suspect does not otherwise stand out." Report at 26. In other words, a reliable array should consist of persons who fit the witness's description and are sufficiently similar that the suspect does not stand out. This is precisely what was done in this case.

The Report also states that "if a significant feature of a suspect's appearance, e.g., a mustache, does not match the witness's description, bias in the array is reduced if the fillers match the suspect, not the description, in that respect." Id. at 27. In this case, Cox's description of the carjacker as a

5'9" black male did not contain any descriptive characteristic upon which Moulton could be singled out from the photos in the array.[6]

Defendant's contention that Det. Stephens' pre-array comments biased the identification is also without merit. As the Magistrate Judge pointed out, when Det. Stephens contacted Cox to ask for help with the investigation, he told Cox that "we may or may not have a suspect." Tr. at 179. Prior to showing Cox the photos, Det. Stephens read Cox a standard photo lineup admonishment, which included advising Cox that the "group of photographs may or may not include a photograph of the person who committed the crime," and that he "should only make an identification if you can do so." Tr. 85-86, Gov't Ex. 1. These admonitions were sufficient to insure that Cox did not feel pressured to pick one of the photos.

Finally, the fact that Det. Stephens knew the identity of the suspect did not render the lineup impermissibly suggestive or unreliable. Defendant

---

[6] Defendant contends that he was the only person in the array with a tattoo on his neck. Like the Magistrate Judge, this Court is unable to discern a tattoo on the neck of any of the persons in the photos. See R&R at 38 n.22; Gov't Ex. 1. In any event, the Court agrees with the Magistrate Judge that this would not render the array unduly suggestive.

speculates that Det. Stephens "likely" gave Cox non-verbal cues and cites the New Jersey Special Master's finding that double-blind lineups are significantly more reliable. Defendant, however, fails to cite any specific evidence that Det. Stephens did or said anything to suggest what photograph Cox should choose or that he should identify someone.[7] Nor does defendant cite any legal authority holding that non-double-blind lineup procedures are impermissibly suggestive or unreliable. The Court concludes that, even though a double-blind procedure may be preferable, the procedure used in this case was not impermissibly suggestive or unreliable.

## Summary

For the foregoing reasons, the Court OVERRULES defendant's objections [#54]; ADOPTS the Magistrate Judge's Report and Recommendation [#49]; and DENIES defendant's motion to exclude photographic lineup and in-court eyewitness identification [#19], motion to

---

[7] Defendant relies on Det. Stephens' testimony that he was watching Cox's eyes as Cox viewed each photo. Tr. at 137. It is pure speculation, however, that this action conveyed any type of non-verbal cue. Indeed, Det. Stephens testified that while he was watching Cox's eyes, Cox was looking "intently" at each photo. Id. Thus, it is highly doubtful that Cox was even aware, either consciously or unconsciously, of Det. Stephens' action.

28

suppress show-up identification [#20], and motion to suppress statements and

evidence [#22].

IT IS SO ORDERED, this ___ day of March, 2011.

Marvin H. Shoob, Senior Judge
United States District Court
Northern District of Georgia

29